**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CITIGROUP GLOBAL MARKETS INC., d/b/a SMITH BARNEY, | ) ) ) | |
| Plaintiff, | ) ) | FILED: APRIL 14, 2008 08 CV 2100   JH |
| v. | ) ) | JUDGE NORGLE MAGISTRATE JUDGE VALDEZ |
| JOHN ORTH, | ) ) ) | |
| Defendant. | ) ) | |

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff Citigroup Global Markets Inc., d/b/a Smith Barney ("Smith Barney"), for its

Verified Complaint against Defendant John Orth ("Orth"), states as follows:

**SUMMARY OF THE CASE**

1.     Orth is a former Smith Barney trainee who now works for Wachovia Securities,

LLC ("Wachovia"), a direct competitor of Smith Barney in the retail brokerage industry.  Smith

Barney recently learned that Orth has been using confidential information from Client Profiles

printed off Smith Barney's computer system to solicit Smith Barney clients he learned of while

working as a trainee.  These clients were introduced to Smith Barney by financial advisor David

Brown ("Brown"), and were assigned to, and serviced by, Brown.  Orth was given access to

information on these clients when he was being trained by Brown.  Now, he is using that

information to divert the clients' accounts to his new employer, Wachovia.  Orth's conduct

violates the contracts Orth agreed to as a condition of his employment with Smith Barney and

constitutes misappropriation of trade secrets.  Orth should be enjoined from soliciting Smith

Barney customers in violation of his agreements and from using Smith Barney's confidential

client information.

148105v5

2.     From November 22, 2005 until August 15, 2007, Orth worked as a financial advisor trainee in Smith Barney's branch office in Naperville, Illinois.  On August 15, 2007, Orth resigned from Smith Barney.  Within a month of his resignation, Orth began working for Wachovia in that firm's Naperville, Illinois office.

3.     Shortly before Orth resigned, he told one of his trainee colleagues, Miguel Rosas, that he had a box at his house which contained Client Profiles for customers assigned to the Naperville branch's most profitable financial advisor, Brown, and implied that he planned to solicit Brown's customers to leave Smith Barney if things ever got rough for him at Wachovia. Client Profiles typically contain client names, contact information, investment history, account data and asset allocations.

4.     Initially, it appeared that Orth was living up to his contractual obligations.  Last week, however, Smith Barney discovered that Orth has begun aggressively soliciting Smith Barney clients assigned to Brown.  In response to Orth's solicitations, clients have begun transferring millions of dollars in assets away from Smith Barney and to Wachovia.  Orth is breaching the non-solicitation covenants in contracts he entered into with Smith Barney and misappropriating Smith Barney's trade secrets.

5.     Smith Barney seeks a temporary restraining order and preliminary injunction enjoining Orth from: (a) destroying any records Orth removed from Smith Barney; (b) using, disclosing, or transmitting for any purpose the information contained in the records of Smith Barney, including personal and financial information of Smith Barney's clients; and (c) soliciting any business from or contacting any Smith Barney clients that Orth had contact with, or whose name became known to him, while in the employ of Smith Barney (other than those friends and

148105v5

family members Orth identified on his resignation letter). In addition, Orth should be ordered to immediately return all original Smith Barney records and copies thereof.

6.       Smith Barney is a member firm, and Orth is a member person, of the Financial Industry Regulatory Association ("FINRA"). Pursuant to Rule 13804 of FINRA's Code of Arbitration Procedure, the parties are subject to mandatory arbitration of this dispute before industry panelists. Smith Barney seeks injunctive relief from this Court only until such time as the arbitrators are impaneled and rule on the merits of Smith Barney's request. By industry rule and custom, the arbitration panel will be in place and schedule a hearing within 15 days after any injunctive order by this Court is entered.

7.       Smith Barney has filed an arbitration petition with FINRA seeking a permanent injunction against Orth and other relief. The interim injunction that Smith Barney now seeks is intended only to maintain the *status quo* until the FINRA arbitration panel can resolve the case on the merits.

## PARTIES

8.       Smith Barney is a corporation organized and existing under the laws of the State of New York. Smith Barney's principal place of business is in New York.

9.       Orth is an individual who, on information and belief, resides in Aurora, Illinois.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and this action is between citizens of different states.

11.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), as it is the district in which Orth resides and in which a substantial part of the events giving rise to the claims occurred.

148105v5

## FACTUAL BACKGROUND

### A.    Orth's Employment With Smith Barney

12.    On November 22, 2005, Orth entered into a Financial Consultant Trainee

Employment Agreement and Restrictive Covenants (the "Employment Agreement," Exhibit A

hereto).  In the Employment Agreement, Orth agreed that he would not solicit clients to leave

Smith Barney for a period of one year after the end of his employment with Smith Barney:

> If, at any time, I resign from Smith Barney, provoke my termination, or
> am terminated for cause, I agree that for a period of one year following my
> termination I will not solicit by mail, by phone, by personal meeting, or by
> any other means, either directly or indirectly, any Account whom I served
> or whose name became known to me during my employment at Smith
> Barney in any office and in any capacity.  My agreement "not to solicit"
> means that I will not, during my employment and for a period of one year
> thereafter, initiate any contact or communication, of any kind whatsoever,
> for the purpose of inviting, encouraging or requesting any Account:
>
> (a)    to transfer from Smith Barney to me or my new employer, or
>
> (b)    to open a new account with me or with my new employer, or
>
> (c)    to otherwise discontinue its patronage and business relationship with
> Smith Barney

Ex. A, ¶ 2.

13.    Orth also agreed to protect the confidentiality of Smith Barney's trade secrets and

confidential company information.  The Employment Agreement provides:

> All records, whether original, duplicated, computerized, memorized, handwritten,
> or in any other form, and all information contained therein, including names,
> addresses, phone numbers, and financial information of any account, customer,
> client, customer lead or prospect ("Account"), are confidential and are the sole
> and exclusive property of Smith Barney.  This information, whether provided to
> me by Smith Barney or by any Account, is entrusted to me as an employee and
> sales representative of Smith Barney.  I will not use this information or remove
> any such records from the Smith Barney office expect for the sole purpose of
> conducting business on behalf of Smith Barney.  I agree not to divulge or disclose
> this information to any competitor of Smith Barney either during my employment
> or at any time thereafter.

> This information is extremely valuable to Smith Barney and Smith Barney takes all reasonable measures to maintain its confidentiality and to guard its secrecy. This information is not generally known outside Smith Barney and within Smith Barney is confidential and used only on a 'need to know' basis. This information is developed and acquired by great expenditures of time, effort, and money. This information is unique and cannot be easily duplicated or acquired. Consequently, I agree that these records and the information contained therein are the property of Smith Barney and are deserving of trade secret status and protection.

Ex. A, ¶ 1 (emphasis in original).

14.     Orth agreed any violation of the confidentiality and non-solicitation covenants in his Employment Agreement would cause irreparable harm to Smith Barney, and consented to the entry of an interim injunction should any such violation occur:

> In the event that I breach any of the covenants of paragraphs 1, 2, or 3, I agree that Smith Barney will be entitled to injunctive relief. I recognize that Smith Barney will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Smith Barney or to protect and preserve the status quo. Therefore, I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION ordering:
>
> (a)     that I immediately return to Smith Barney all records whether original, duplicated, computerized, handwritten, or in any form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and
>
> (b)     that, for a period of one year, I be enjoined and restrained from soliciting any Account whom I served or whose name became known to me while employed by Smith Barney, in any office and in any capacity . . .

Ex. A, ¶ 4.

15.     At the time of his resignation, Orth was managing very few clients of his own. He was new to the securities business and was a financial consultant "trainee." Smith Barney did not require Orth to "earn his keep" through customer commissions, but rather paid him a salary while he learned how to do his job and obtained his securities licenses.

16.     To foster Orth's training, he was assigned to a brokerage team led by a senior Smith Barney broker, Brown, one of the most productive brokers in the Naperville branch.

Brown helped Orth learn how to be a securities broker and allowed him to interface with some of the clients assigned to Brown. However, it was always understood that the clients were assigned to Brown, that Brown was responsible for servicing those clients' accounts, and that revenues generated by the clients would be credited to Brown. At all times, Smith Barney's records indicated that Brown was the financial advisor responsible for servicing the client accounts at issue here.

17.     To protect Brown's client base in the event Orth resigned from Smith Barney, Orth was required to sign a Team Agreement for Financial Consultants. ("Team Agreement," Exhibit B hereto (without exhibits).) The Team Agreement prevents Orth from soliciting any customer introduced to him by Brown if Orth terminates his employment with Smith Barney. Ex. B, Article VI, "COVENANT NOT TO SOLICIT." Orth also consented in the Team Agreement to the entry of an interim injunction in the event Orth breaches the Agreement's non-solicitation covenants. Ex. B, Article VII, "BREACH OF COVENANTS."

18.     With the exception of a few family members and personal friends, all of the clients Orth came into contact with while he worked for Smith Barney were Brown's clients or had been assigned to some other Smith Barney broker. Brown, not Orth, originated these client relationships and earned all of the commission revenue attributable to the clients. Smith Barney allowed Orth access to confidential information about these clients, and permitted Orth to work with some of these clients, on the condition that he would use the information only on Smith Barney's behalf, abide by the non-solicitation covenants in his Employment and Team Agreements, and otherwise honor his contractual, statutory, and fiduciary duties to maintain the confidentiality of Smith Barney's trade secrets and client confidences.

148105v5

19.     When Orth resigned on August 15, 2007, his manager, Phillip Hall ("Hall"),
reminded him of his obligation not to solicit Smith Barney's customers. Orth acknowledged this
obligation and expressly promised not to solicit Smith Barney's customers, with the sole
exception of the personal friends and family members identified in his resignation letter. *See* Ex.
C hereto. Orth did not inform Hall that he had retained print-outs of Client Profiles of Brown's
clients.

**B.     Smith Barney's Clients and Goodwill**

20.     Smith Barney's client base and client information are the lifeblood of its business.
Smith Barney spends millions of dollars every year on national and local advertising, along with
many millions of dollars per year for sales support staff, clearing services, operations personnel,
systems and support, management and compliance supervision, salaries, annual registration fees,
computer services and equipment, phones, mail, research, literature, seminars, trade and other
professional news publications, promotional events, and the retention of experts in tax, asset
management, employee and health benefits, insurance, real estate, estate planning, and numerous
other sub-specialties. Smith Barney invests these resources to maintain its goodwill and grow its
customer base in the securities industry.

21.     Clients who open accounts with Smith Barney typically develop close
relationships with the Smith Barney representatives they deal with, and they entrust those
representatives with sensitive financial and personal information. In part because of these
relationships, which Smith Barney encourages and fosters, clients generally remain with Smith
Barney for many years.

22.     In addition to the training and access to clients and potential clients that Smith
Barney provided to Orth, Orth benefited directly from the goodwill, reputation, and name
recognition generated by Smith Barney.

23.     Smith Barney also provided Orth with sophisticated financial products to sell to Smith Barney's clients as well as considerable technology and human resources to effectively manage client assets.  Smith Barney allowed Orth access to its clients, including clients serviced by Brown, in reliance on his contractual promises to Smith Barney.

### C.     Orth's Post-Resignation Solicitations Of Brown's Clients

24.     To the best of Smith Barney's knowledge, Orth initially refrained, for a time, from soliciting Smith Barney's clients.  However, Smith Barney recently learned that in March 2008 Orth began actively soliciting Smith Barney clients to leave Smith Barney and move their accounts to Wachovia.  These acts are consistent with the statements Orth made to Miguel Rosas before he resigned regarding his intent to solicit Brown's customers using the Client Profiles he kept at his house.

25.     In response to Orth's solicitations, clients have transferred several million dollars in assets from Smith Barney to Wachovia.  This represents a loss in revenue to Smith Barney of well over $100,000.  At all relevant times, these clients were assigned to, and serviced by, Brown.  Orth never would have met these customers but for Smith Barney and Brown's introduction.  The assets that Orth has already diverted to Wachovia exceed the value of the assets that Orth himself developed through his own work during his entire time at Smith Barney.

26.     There is no genuine dispute about whether Orth solicited Smith Barney's clients in violation of his contracts.  Indeed, in explaining the reasons for their transfer of assets, the clients have specifically stated that they are doing so in response to Orth's request.

### D.     The Protocol

27.     Smith Barney, Wachovia and certain other retail brokerage firms are parties to an agreement called the Protocol For Broker Recruiting ("Protocol").  *See* Ex. D hereto.  The Protocol is designed to protect the confidentiality of client information.  It sets forth in detail

- 8 -

what limited client information a departing employee may take to a firm that has agreed to the Protocol. Provided that the departing employee takes only the client information permitted under the Protocol and abides by the notification procedures in the Protocol, his or her former employer will not seek to enforce any non-solicitation covenants with respect to that employee's clients.

28.     Importantly, the Protocol (a) is expressly limited to situations where the former employee follows the procedures in the Protocol and (b) only covers the former employee's clients. The Protocol does not restrict the right to enforce non-solicitation covenants in circumstances where a former employee fails to comply with the Protocol procedures. Nor does it restrict a firm's right to enforce non-solicitation covenants with respect to clients serviced by other brokers. Thus, the Protocol allows firms to protect other brokers from losing the goodwill and client relationship developed through their own efforts. The Protocol also does not apply when a former employee is a member of a brokerage team. In that situation, the team agreement governs, not the Protocol. *See* Ex. D at 2.

29.     The Protocol does not apply in this situation for several reasons. First, Orth did not comply with the Protocol, in that he did not disclose to his branch manager the information he retained regarding Smith Barney clients. Instead, he secretly retained extremely sensitive client records, then lied to Smith Barney about doing so. Second, Orth also failed to comply with the Protocol by retaining information concerning, and then later soliciting, clients serviced by another broker, Brown. Third, Orth only had access to information regarding Brown's clients because of his team agreement with Brown.

**E.     Smith Barney Aggressively Protects the Confidentiality of Its Client Information**

30.     The information Smith Barney has assembled to service its clients, such as the Client Profiles taken by Orth, cannot be readily duplicated. The confidential information Smith

- 9 -

Barney maintains enables a sophisticated analysis of clients' financial information that is unique to Smith Barney.

31.     This confidential information, if known to competitors such as Wachovia, would put Smith Barney at a considerable disadvantage.

32.     As an employee of Smith Barney and as part of his duties to Smith Barney, Orth had access to a vast array of information concerning Smith Barney's clients, including their buying and selling habits, their personal holdings, their product preferences, their tolerance for risk and their personal contact information.

33.     Smith Barney limits access to such confidential information through the use of security access cards, copy controlled documents and multiple layers of password protections for computer databases which contain information developed by or provided to Smith Barney.

**F.     Injunctive Relief Is Needed to Protect Smith Barney's Business and Client Confidentiality**

34.     As the facts set forth above demonstrate, Orth is in breach of his agreements not to solicit Smith Barney's clients and not to misuse Smith Barney's confidential client and business information.

35.     Concurrently with this proceeding, Smith Barney is initiating an arbitration before FINRA, seeking a permanent injunction, damages and other relief.  However, absent the interim injunctive relief sought in this proceeding, any award which Smith Barney may obtain in that arbitration would be rendered ineffectual.

36.     Orth's conduct is harming client relationships that Smith Barney spent considerable time and resources to build.  This harm is irreparable – as Orth stipulated in his contracts with Smith Barney – because client relationships are inherently delicate and cannot be repaired with money damages.

148105v5

37.     In circumstances such as these, where Smith Barney invests significant time and money in assuring the confidentiality of its client information and where the dissemination of said information would greatly damage Smith Barney's business, injunctive relief is available to Smith Barney as a matter of right.  Indeed, both the Employment Agreement and the Team Agreement provide for entry of an immediate injunction by this Court barring any further solicitations and misuse of Smith Barney's confidential information.

## COUNT I
## BREACH OF CONTRACT-THE EMPLOYMENT AGREEMENT

38.     Smith Barney repeats and realleges the foregoing paragraphs as if fully set forth herein.

39.     Orth is contractually bound to abide by the terms of the Employment Agreement he signed as a condition of his employment with Smith Barney.

40.     Orth breached his obligations to Smith Barney under the Employment Agreement by, among other things, (i) soliciting clients of Smith Barney after his departure from Smith Barney and (ii) using confidential or trade secret information to compete with Smith Barney.

41.     Smith Barney has performed all of its duties and satisfied all of its obligations under the Employment Agreement.

42.     Smith Barney has been damaged as a result of Orth's ongoing breaches of his contractual duties.  Smith Barney has suffered irreparable harm as a result of Orth's conduct and will continue to suffer irreparable harm unless he is enjoined from engaging in any such further conduct.

## COUNT II
## BREACH OF CONTRACT – THE TEAM AGREEMENT

43.     Smith Barney repeats and realleges the foregoing paragraphs as if fully set forth herein.

- 11 -

148105v5

44.     Orth is contractually bound to abide by the terms of the Team Agreement he signed as a condition of operating as a member of a team with Brown during his employment with Smith Barney.

45.     Orth breached his obligations to Smith Barney under the Team Agreement by, among other things, (i) soliciting clients of Smith Barney serviced by Brown after his departure from Smith Barney and (ii) using confidential or trade secret information to compete with Smith Barney.

46.     Smith Barney has performed all of its duties and satisfied all of its obligations under the Team Agreement.

47.     Smith Barney has been damaged as a result of Orth's ongoing breaches of his contractual duties.  Smith Barney has suffered irreparable harm as a result of Orth's conduct and will continue to suffer irreparable harm unless he is enjoined from engaging in any such further conduct.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS

48.     Smith Barney repeats and realleges the foregoing paragraphs as if fully set forth herein.

49.     Smith Barney's client information, including, but not limited to, the names, addresses, social security numbers, account types and names, objectives, trade histories, and other financial information of its clients, are Smith Barney's confidential and proprietary business records and constitute trade secrets under Illinois law.

50.     Orth has wrongfully retained Client Profiles printed from Smith Barney's computer system.  Client Profiles typically contain client names, addresses, phone numbers, e-mail addresses, social security numbers, account types and numbers, investment history and asset

allocation. The confidential and proprietary customer information misappropriated from Smith Barney by Orth has actual or potential independent economic value from not being generally known to the public or other persons who can obtain economic value from their disclosure or use.

51.     Smith Barney has taken more than adequate measures to maintain the secrecy and confidentiality of its confidential and trade secret information, including but not limited to, (a) requiring Orth and other employees to sign an employment agreement containing confidentiality provisions as a condition of their employment with Smith Barney; (b) maintaining such information in secured hard copy files and/or pass-code protected computer files; and (c) limiting access to such information on a need-to-know basis.

52.     Orth has used and will continue to use Smith Barney's trade secrets in order to solicit Smith Barney's customers and accounts, and to divert their business from Smith Barney to Wachovia, a direct competitor of Smith Barney.

53.     By removing Smith Barney's confidential and proprietary customer information and also by using such information to his own advantage and against the interests of Smith Barney, Orth has violated his contract with Smith Barney and the Illinois Trade Secrets Act.

54.     Orth's actions constitute actual and threatened misappropriation of trade secrets in violation of Illinois Trade Secrets Act, 765 ILCS 1065/1, *et. seq.*

55.     Smith Barney has been damaged as a result of Orth's conduct. Smith Barney has suffered irreparable harm as a result of Orth's conduct and will continue to suffer irreparable harm unless Orth is enjoined from engaging in any such further conduct.

**WHEREFORE**, Smith Barney respectfully requests that this Court issue an Order:

148105v5

(a)     enjoining Orth, and all others acting in concert with him, from:

    (i)     destroying any of the records and/or information that Orth removed from Smith Barney;

    (ii)    using, disclosing, or transmitting for any purpose – including the initiation of any contact with or the solicitation of Smith Barney clients – the information contained in the records of Smith Barney, including, but not limited to, the names, addresses, and financial information of said clients; and

    (iii)   initiating any further contact or communication with, including soliciting any business from, customers whom Orth had contact with or whose name became known to him while in the employ of Smith Barney (other than those friends and family members identified in his resignation letter);

(b)     ordering Orth to immediately return to counsel for Smith Barney all original records and copies and/or other reproductions thereof, and/or any other documents containing information derived from those records, in whatever form, including electronic or computerized versions (including diskettes thereof); and

(c)     granting such other relief as this Court deems just and appropriate.

- 14 -

148105v5

Dated:  April 14, 2008

Respectfully submitted,

CITIGROUP GLOBAL MARKETS INC.,
d/b/a SMITH BARNEY


By:  ___/s/ Gary M. Miller_____
     One of Its Attorneys


Gary M. Miller
Daniel M. Hinkle
GRIPPO & ELDEN LLC
111 South Wacker Drive
Chicago, IL  60606
(312) 704-7700

148105v5

## **VERIFICATION**

Under penalties of perjury under the laws of the United States, the undersigned certifies

that the statements set forth in the foregoing Verified Complaint for Injunctive Relief are true

and correct, except as to matters therein stated to be on information and belief and as to such

matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated:  April //, 2008

By: _____

Phillip Hall
Smith Barney Branch Manager,
Naperville, Illinois

08 CV 2100
JUDGE NORGLE
MAGISTRATE JUDGE VALDEZ

# EXHIBIT A

# FINANCIAL CONSULTANT TRAINEE
# EMPLOYMENT AGREEMENT
# AND RESTRICTIVE COVENANTS

**SMITH BARNEY**
citigroup

| Name of Smith Barney Financial Consultant Trainee: JOHN ORTH | Branch Name NAPERVILLE | Branch Number 21A |
|---|---|---|

In consideration of Citigroup Global Markets Inc. ("Smith Barney") employing me; compensating me; providing to me employment related benefits; training me; sponsoring me for the General Securities Examination; registering me with various exchanges; licensing me in various states; providing me with office facilities and sales support; executing, processing and clearing transactions; providing research and investment recommendations; supervising the development of my career; and other good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged, and intending to be legally bound, I hereby agree that:

1. All records, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein, including names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Smith Barney. This information, whether provided to me by Smith Barney or by any Account, is entrusted to me as an employee and sales representative of Smith Barney. I will not use this information or remove any such records from the Smith Barney office except for the sole purpose of conducting business on behalf of Smith Barney. I agree not to divulge or disclose this information to any competitor of Smith Barney either during my employment or at any time thereafter.

This information is extremely valuable to Smith Barney and Smith Barney takes all reasonable measures to maintain its confidentiality and to guard its secrecy. This information is not generally known outside Smith Barney and within Smith Barney is confidential and used only on a "need to know" basis. This information is developed and acquired by great expenditures of time, effort, and money. This information is unique and cannot be easily duplicated or acquired. Consequently, I agree that these records and the information contained therein are the property of Smith Barney and are deserving of trade secret status and protection.

2. If, at any time, I resign from Smith Barney, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any Account whom I served or whose name became known to me during my employment at Smith Barney in any office and in any capacity. My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account:

(a) to transfer from Smith Barney to me or to my new employer, or

(b) to open a new account with me or with my new employer, or

(c) to otherwise discontinue its patronage and business relationship with Smith Barney.

3. I agree that at all time during my employment I owe Smith Barney a duty of loyalty and a duty to act in good faith. I agree that during my employment I will not individually, or in combination with any other employee or competitor of Smith Barney, violate or breach the terms of this agreement.

4. In the event I breach any of the covenants of paragraphs 1, 2 or 3, I agree that Smith Barney will be entitled to injunctive relief. I recognize that Smith Barney will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Smith Barney or to protect and preserve the status quo. Therefore, I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION ordering:

(a) that I immediately return to Smith Barney all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and

(b) that, for a period of one year, I be enjoined and restrained from soliciting any Account whom I served or whose name became known to me while employed by Smith Barney, in any office and in any capacity; and

(c) that I be further enjoined and restrained, for a period of one year, from accepting business from any Account who was solicited in violation of paragraph 2 or whose records and information was used in violation of paragraph 1.

The above restraints shall apply to each and every Account whom I served or whose name became known to me while employed at Smith Barney, in any office and in any capacity, including without limitation, reassignments, walk-ins, call-ins, write-ins, transfers, referrals, prospects, cold-calls, seminars, mailers, lead lists, and etc. During my employment, some of the accounts I expect to develop and acquire are likely to be those of individuals I knew or was familiar with prior to joining Smith Barney ("Prior Acquaintances"). Nevertheless, because I will be acting as a representative of Smith Barney and I will be utilizing and benefiting from Smith Barney's goodwill, reputation, name recognition, and other assets and resources, I further agree that the Accounts of such Prior Acquaintances will be subject to the same restraints as all the other Accounts. The only exception will be my family and relatives.

5. For the purposes of paragraph 4, I agree to submit to, and confer jurisdiction on, the United States District Court or the State Court which has original jurisdiction for the judicial district or county in which I last worked for Smith Barney. This Agreement shall be construed, governed by, and enforced in accordance with the laws of said jurisdiction.

6. If after issuance of a TEMPORARY RESTRAINING ORDER or a PRELIMINARY or PERMANENT INJUNCTION, the parties agree to submit the underlying claim to arbitration in accordance with the applicable industry rules and regulations. In the event Smith Barney institutes legal or equitable proceedings to enforce or collect damages under this contract, I agree to pay Smith Barney attorney's fees with interest and costs.

7. NOTHING HEREIN IS A PROMISE OF EMPLOYMENT FOR A FIXED TERM. SMITH BARNEY MAY TERMINATE MY EMPLOYMENT FOR ANY REASON OR FOR NO REASON, JUST AS I MAY RESIGN AT ANY TIME.

8. I HAVE READ AND REVIEWED THIS EMPLOYMENT AGREEMENT AND RESTRICTIVE COVENANTS IN ITS ENTIRETY. I HAVE BEEN GIVEN AN OPPORTUNITY TO ASK SMITH BARNEY QUESTIONS ABOUT IT. I HAVE ALSO BEEN GIVEN AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF MY CHOICE. I FULLY UNDERSTAND THE TERMS OF THIS DOCUMENT AND KNOWINGLY AND FREELY AGREE TO ABIDE BY THEM.

IN ADDITION TO THE FOREGOING, I UNDERSTAND THAT I HAVE AN ADDITIONAL THIRTY DAYS FROM THE DAY I SIGN THIS AGREEMENT TO CONTINUE TO REVIEW IT AND SEEK LEGAL COUNSEL. AT ANY TIME WITHIN THIS THIRTY DAYS, I MAY RESCIND THIS AGREEMENT BY DISCONTINUING MY EMPLOYMENT WITH SMITH BARNEY WITHOUT ANY OF THE PROVISIONS HEREIN BEING ENFORCED AGAINST ME. HOWEVER, IF I CONTINUE MY EMPLOYMENT WITH SMITH BARNEY BEYOND SAID THIRTY DAYS, MY CONTINUATION OF EMPLOYMENT WILL CONSTITUTE MY RATIFICATION AND COMPLETE ACCEPTANCE OF THE TERMS OF THIS AGREEMENT.

FINANCIAL CONSULTANT
TRAINEE SIGNATURE _____

Dated _____11/22/05_____

For Smith Barney:

BRANCH MANAGER'S
SIGNATURE _____

Dated _____

Smith Barney is a division of Citigroup Global Markets Inc.

# EXHIBIT B

# TEAM AGREEMENT FOR FINANCIAL CONSULTANTS

**SMITH BARNEY**
**citigroup**

This Agreement, dated __11/22/05__ (the "Agreement") is between and among __John Orth__
__+ David Brown__

and Citigroup Global Markets Inc. ("SB"), a New York corporation with its principal place of business located at 388 Greenwich Street, New York, New York 10013 (collectively referred to as the "parties").

## RECITALS

The above named individuals are all employed by SB as Financial Consultants ("FCs"); The FCs desire to form a "Team" to better serve their mutual clients;

The parties to this agreement desire to set forth their understanding regarding the formation of such a Team and to the FCs' sharing of certain accounts, gross commissions, payments and expenses; according to the terms and conditions stated in this Agreement.

In consideration for the mutual covenants and promises contained in this Agreement, the parties agree as follows:

## I. THE JOINT PRODUCTION NUMBER

a) Each FC shall provide SB with a list of all accounts that are to be included in a Joint Production Number and the list shall designate which FC introduced the accounts to the Joint Production Number. Said list, which is subject to modification and approval by SB, is attached to this Agreement as Exhibit A ("Contributed Client List") and made a part of this Agreement.

b) It is the responsibility of the FCs to continuously amend and update Exhibit A to reflect all accounts that are included in the Joint Production Number after the execution of this Agreement.

c) Notwithstanding anything to the contrary in sub-paragraphs (a) or (b) of this section or elsewhere in this Agreement, in the event that Exhibit A is not completed, amended or updated as required by sub-paragraphs (a) or (b) of this section, the provisions of sections V (Confidential Information), VI (Covenant Not to Solicit) and VII (Breach of Covenants) shall apply to all accounts, if any, identified in Exhibit A and to all accounts in the Joint Production Number which are not included in Exhibit A.

d) Unless specifically excluded in writing signed by each FC, all new accounts opened by each FC will be considered as having been introduced to the Joint Production Number by that FC and will be assigned by SB to the Joint Production Number, and shall be subject to the terms and conditions of this agreement.

## II. GROSS PRODUCTION

Subject to the provisions of this Agreement, the parties agree that gross production, shall be allocated by SB from Joint Production Number __TBD__ entitled __Brown-Orth__ as follows:

a) The FCs will share all gross production generated in the Joint Production Number pursuant to the following percentages:

| FC Name | Primary FC# | Percentage |
|---|---|---|
| DAVID N. BROWN | 336 | 50 |
| John Orth | TBD | 50 |
| | | |
| | | |
| | | 100% |

b) Each FC's individual production, based upon the allocations set forth in subparagraph (a) of this section, will be the basis for determining eligibility

6607 (11/2004) page 1 of 4

for purposes of Firm's funded deferred compensation, bonuses, SB's normal published compensation schedule and all recognition clubs, trips and/or awards. The combined production of the Team will not be considered.

c) It is the responsibility of the FC's to continuously amend and update this Section II to reflect any changes to the allocation percentages of gross production from the Joint Production Number after the execution of this agreement.

## III. EXPENSES

a) Team expenses, including but not limited to support staff, equipment, travel, hosting of special events such as seminars, and other business expenses shall be shared pursuant to the following percentages:

| FC Name | Primary FC# | Percentage |
|---|---|---|
| DAVID N. Brown | 336 | 100% |
| | | |
| | | |
| | | |
| | | 100% |

b) In order to share its business expenses, the Team should establish an FMA checking account at SB to be utilized as a common expense account. This FMA checking account will be governed by published guidelines.

c) Notwithstanding the foregoing, all staff payments must be established through the Firm's SAM (Sales Assistant Management) system in accordance with SB policy.

d) Any other allocation of expenses or revenue, including but not limited to legal settlements judgments, awards, trade adjustments or errors, not specifically stated in Section III (a) shall be determined by the Branch Office Manager, in his/her sole discretion.

e) It is the responsibility of the FC's to continuously amend and update this Section III to reflect any changes to the sharing of expenses percentages after the execution of this agreement.

## IV. TERMINATION OF AGREEMENT

a) Each FC shall have the right to terminate this Agreement for any reason or for no reason upon thirty (30) days prior written notice to SB and to each other.

b) SB shall have the right to terminate this Agreement for any or no reason upon written notice to the FCs.

c) In the event this Agreement is terminated by any of the parties and any FCs are still employed by SB at the time of the termination of this Agreement, then the accounts comprising the Joint Production Number shall be reassigned to the FC designated for each account as set forth in Exhibit A attached hereto;

d) With respect to all accounts that are a part of the Joint Production Number but not set forth on Exhibit A, the FCs must notify their Branch Office Manager in writing, within five (5) days of the Agreement's termination as to which FC shall service such accounts following the termination of this Agreement. In the event that any account in the Joint Production Number shall be in dispute at the termination of this Agreement, the FCs acknowledge and agree that their Branch Manager, in his/her sole discretion will make the final binding determination as to which FC shall service such account following the termination of this Agreement.

e) Upon the termination of this Agreement pursuant to subparagraphs (a) or (b) of this section, any remaining Team expenses shall be paid according to the percentages in section III (Expenses). Thereafter, any remaining funds in the common expense fund ("FMA") shall be allocated to the FCs according to the percentages in section III (a). In the event that the Team members are unable to resolve among themselves, including issues involving support staff and equipment, shall be resolved by the Branch Manager in his/her sole discretion.

any FC's employment with SB is terminated during the term of this Agreement for any or no reason, then this Agreement shall be deemed terminated and his/her accounts as set forth in Exhibit A shall continue to be serviced by the remaining FCs on the condition that the Branch Office Manager, in his/her sole discretion, determines that it is appropriate for the remaining FCs to service the accounts. In the event that the Branch Manager determines that it is not appropriate for the remaining FCs to service any of the accounts, such accounts will be reassigned by the Branch Office Manager in his/her sole discretion.

g) Upon the termination of this Agreement as to any FC pursuant to sub-paragraph (f) of this section, such FC's contribution to any common expense fund shall be waived and forfeited, and such FC shall continue to be responsible for his/her portion of any outstanding Team expenses. To the extent that the terminated FC has not contributed sufficient funds to the common expense account to cover his/her prorata portion of such outstanding expenses, he/she shall promptly remit such funds.

h) In the event of the death or disability of any FC who is a party to this Agreement, then this Agreement shall be deemed terminated and his/her accounts, as set forth in Exhibit A shall continue to be serviced by the surviving FCs on the condition that the Branch Office Manager, in his/her sole discretion, determines that it is appropriate for the surviving FCs to service the accounts. In the event that the Branch Manager determines that it is not appropriate for the remaining FCs to service any of the accounts, the accounts will be reassigned by the Branch Manager in his/her sole discretion. Disability, for the purposes of this Agreement, shall be defined as commencing as of the date the FC, after completing Short-Term Disability, becomes eligible to apply for Long-Term Disability under SB's Long-Term Disability Policy in effect at that time. Upon the termination of this Agreement pursuant to this sub-paragraph, such FC's contribution to any common expense fund shall be waived and forfeited, but such FC or FC's estate shall no longer be responsible for any Team expenses.

i) In the event any FC's employment with SB terminates by reason of retirement, as defined in the Citigroup Pension Plan and the retiring FC has entered into the Franchise Protection Plan ("FPP"), then this Agreement shall be deemed terminated and his/her accounts, as set forth in Exhibit A, shall be distributed pursuant to the FPP. Upon the termination of this Agreement pursuant to this sub-paragraph, such FC's contributions to any common expense fund shall be waived and forfeited, but such FC shall no longer be responsible for any Team expenses.

j) The parties to this Agreement acknowledge and agree that the terms and conditions of sections IV (Termination of Agreement), V (Confidential Information), VI (Covenant Not to Solicit), VII (Breach of Covenants), VIII (Jurisdiction) and XIII (Miscellaneous) shall survive the termination of this Agreement.

## V. CONFIDENTIAL INFORMATION

Each FC recognizes and agrees that all records, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein, including names, addresses, telephone numbers, and financial information ("information") of any account introduced to the Joint Production Number by any of the other FCs whether or not actually designated on Exhibit A, is confidential and the sole and exclusive property of SB. This information is not generally known outside SB and is confidential and used only on a "need to know" basis. Further, this information is unique and cannot be easily duplicated or acquired. Consequently, the FCs will not use this information or remove any such records from any SB office except for the sole purpose of conducting business on behalf of SB. The FCs agree not to divulge or disclose this information to any third party either during their employment or at any time thereafter.

## VI. COVENANT NOT TO SOLICIT

If, at any time, any FC who is a party to this Agreement resigns from SB, provokes his/her termination, or is terminated for cause, such FC agrees that for a period of one year following his/her termination, he/she will not solicit, by mail, by telephone, by personal meeting, or by any other means, either directly or indirectly, any account introduced to the Joint FC Number by any other FC, whether or not actually designated on Exhibit A. This agreement "not to solicit" means that such FC will not, during his/her employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever for the purpose of inviting, encouraging or requesting any such account:

a) to transfer from SB to them or to their new employer, or

b) to open a new account with them or with their new employer, or

c) to otherwise discontinue such account's patronage and business relationship with SB or the other FCs.

## VII. BREACH OF COVENANTS

In the event that any FC who is a party to this Agreement breaches any of the covenants of Sections VI (Covenant Not to Solicit), such FC agrees that SB will be entitled to injunctive relief. The FC recognizes that SB will suffer immediate and irreparable harm and that money damages will not be adequate to compensate SB or to protect and preserve the status quo. Therefore, such FC consents to the issuance of a Temporary Restraining Order, or a Preliminary or Permanent Injunction ordering:

a) that he/she immediately return to SB all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever relating to accounts designated in Exhibit A and/or introduced to the Joint Production Number by another FC, and that he/she be enjoined and restrained from using or disclosing any information contained in such records; and

b) that, for a period of one (1) year, he/she be enjoined and restrained from soliciting any account designated in Exhibit A and/or introduced to the Joint Production Number by another FC.

## VIII. JURISDICTION

For the purpose of Section VII (Breach of Covenants), each FC agrees to submit to, and confer jurisdiction on, the United States District Court or the State Court which has original jurisdiction for the judicial district or county in which he/she last worked for SB. After issuance of a Temporary Restraining Order or a Preliminary or Permanent Injunction, each FC agrees to submit any underlying claim pertaining to this Agreement or the termination thereof to arbitration in accordance with applicable Industry rules and regulations.

## IX. EMPLOYMENT-AT-WILL

Each FC acknowledges, understands and agrees that the employment relationship between him/her and SB is "at will" which affords any party to this Agreement the right to terminate the employment relationship at any time, for any, or no reason, not otherwise prohibited by applicable law. Each FC expressly agrees and acknowledges that this Agreement is not an employment contract or an agreement to employ him/her for a specified period of time or a promise of continued employment with SB for any period of time whatsoever.

## X. NON-WAIVER

Each FC understands that SB may at various times decide not to enforce all or part of this Agreement or similar Agreements with other SB FCs. Each FC agrees that such instances of non-enforcement shall not constitute a waiver, and will not prevent SB from enforcing any or all of the remaining portions of this Agreement against each FC.

## XI. NON-ASSIGNABILITY

Neither this Agreement nor any right, duty, obligation or interest hereunder shall be assignable or delegable by any of the FCs.

## XII. AMENDMENTS

This Agreement may be amended, modified, superseded or cancelled, and the terms or covenants hereof may be waived, only by a written instrument signed by each of the parties hereto, or in the case of a waiver, by the party waiving compliance.

## XIII. MISCELLANEOUS

a) Each FC will at all times comply with SB's internal policies and procedures as well as state and federal securities laws, and the rules of the various exchanges and other regulatory bodies to which SB and he/she are subject. Nothing in this Agreement is intended to amend, supercede, limit or modify any SB policy or procedure or other agreements that any of the FCs may have with SB.

b) Notwithstanding any provision in this Agreement, each FC acknowledges, understands and agrees that the ultimate decision as to whether any FC can service an account and any arrangement as to the sharing of commissions, expenses, payments and/or income derived from said account lies solely with SB.

c) The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement; and, this Agreement shall be interpreted and governed by the laws of the State of New York without regard to its conflicts of law.

d) The captions of the various sections of this Agreement are for convenience and organization only, and are not intended to be a part of the body of this Agreement, nor are they intended to be referred to in construing the provisions of this Agreement.

e) This Agreement supersedes, revokes and/or cancels any and all previous agreements between the FCs.

Each FC whose signature is contained below acknowledges that he/she (i) has read and reviewed this Agreement in its entirety, (ii) was given an opportunity to ask SB questions about it, and, (iii) fully understands the terms of this document and knowingly and freely agrees to abide by them.

## CITIGROUP GLOBAL MARKETS INC.

| By: Print Name | Signature | Date |
|---|---|---|
| John Orth | | 12/5/5 |
| FC: Print Name | Signature | Date |
| David N. Brown | | 12/5/05 |
| FC: Print Name | Signature | Date |
| FC: Print Name | Signature | Date |
| FC: Print Name | Signature | Date |
| FC: Print Name | Signature | Date |
| FC: Print Name | Signature | Date |

## CITIGROUP GLOBAL MARKETS INC.

| By: Branch Manager JAMES P. O'CONNELL | Signature | Date 12/6/05 |
|---|---|---|

# EXHIBIT C

August 15, 2007


Phillip Hall
Branch Manager
Smith Barney
535 E. Diehl Road
Naperville, Illinois 60563

Dear Phil,

Per our conversation today, I am hereby resigning from my position as Financial Advisor in the Naperville office.  My last day of employment will be today.

Per our conversation , my understanding is that you will not recoup costs for my training as an FA.

In my new employment, I will most likely solicit the following households:
Robert & Nancy Orth
Jeffrey, Jane, and Thomas Kastner
Peggy Newel
James & Lisa Jump
Joseph Slogar
John Pritchett
Kimberly McShea
Anthony Houston
Christopher Rigdon
William Prothman
Andy Seto
Michael Stan
Todd Cline

I will not solicit any other clients of Smith Barney.


Sincerely,


John Orth
Financial Advisor


Received: August 15, 2007
Phil Hall

# EXHIBIT D

## PROTOCOL FOR BROKER RECRUITING

The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms  If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding "  The signatories to this protocol agree to implement and adhere to it in good faith

When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information  client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information  Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her  The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR  The local branch management will send the information to the firm's back office  In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her

To ensure compliance with GLB and SEC Regulation SP, the new firm will limit the use of the Client Information to the solicitation by the RR of his or her former clients and will not permit the use of the Client Information by any other RR or for any other purpose  If a former client indicates to the new firm that he/she would like the prior firm to provide account number(s) and/or account information to the new firm, the former client will be asked to sign a standardized form authorizing the release of the account number(s) and/or account information to the new firm before any such account number(s) or account information are provided

The prior firm will forward to the new firm the client's account number(s) and/or most recent account statement(s) or information concerning the account's current positions within one business day, if possible, but, in any event, within two business days, of its receipt of the signed authorization  This information will be transmitted electronically or by fax, and the
requests will be processed by the central back office rather than the branch where the RR was employed  A client who wants to transfer his/her account need only sign an ACAT form

WI850873v1

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms. A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm.

The RR's former firm is required to preserve the documents associated with each account as required by SEC regulations or firm record retention requirements.

It shall not be a violation of this protocol for an RR, prior to his or her resignation, to provide another firm with information related to the RR's business, other than account statements, so long as that information does not reveal client identity.

Accounts subject to a services agreement for stock benefits management services between the firm and the company sponsoring the stock benefit plan that the account holder participates in (such as with stock option programs) would still be subject to (a) the provisions of that agreement as well as to (b) the provisions of any account servicing agreement between the RR and the firm. Also, accounts subject to a participation agreement in connection with prospecting IRA rollover business would still be subject to the provisions of that agreement.

If an RR is a member of a team or partnership, and where the entire team/partnership does not move together to another firm, the terms of the team/partnership agreement will govern for which clients the departing team members or partners may take Client Information and which clients the departing team members or partners can solicit. In no event, however, shall a team/partnership agreement be construed or enforced to preclude an RR from taking the Client Information for those clients whom he or she introduced to the team or partnership or from soliciting such clients.

In the absence of a team or partnership written agreement on this point, the following terms shall govern where the entire team is not moving. (1) If the departing team member or partner has been a member of the team or partnership in a producing capacity for four years or more, the departing team member or partner may take the Client Information for all clients serviced by the team or partnership and may solicit those clients to move their accounts to the new firm without fear of litigation from the RR's former firm with respect to such information and solicitations; (2) If the departing team member or partner has been a member of the team or partnership in a producing capacity for less than four years, the departing team member or partner will be free from litigation from the RR's former firm with respect to client solicitations and the Client Information only for those clients that he or she introduced to the team or partnership.

If accounts serviced by the departing RR were transferred to the departing RR pursuant to a retirement program that pays a retiring RR trailing commissions on the accounts in return for certain assistance provided by the retiring RR prior to his or her retirement in transitioning the accounts to the departing RR, the departing RR's ability to take Client Information related to those accounts and the departing RR's right to solicit those ac-

-2-

counts shall be governed by the terms of the contract between the retiring RR, the departing RR, and the firm with which both were affiliated

A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto  A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory  The protocol will remain in full force and effect with respect to those signatories who have not withdrawn

Citigroup Global Markets Inc  ("Smith Barney")

By _____
Name   Kevin McManus
Title    Managing Director and Chief
         Administrative Officer, Private
         Client Branch System


Merrill Lynch, Pierce, Fenner & Smith Incorporated

By _____
Name   Phil Sieg
Title    Managing Director, Head of Strategic
         Leadership and Development


UBS Financial Services Inc.

By _____ EVP
Name   Barry Buchsbaum
Title    Director of Strategic Development
         Executive Vice President

JOINDER AGREEMENT FOR BROKER PROTOCOL

In consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned company hereby joins and becomes a party to the Protocol for Broker Recruiting and agrees to be bound by the terms of, and perform its obligations under the Protocol for Broker Recruiting

Dated as of the 10 day of January, 2006

WACHOVIA SECURITIES LLC

By _____
Name ELLIOT T WALKER, III. "CHIP"
Title MANAGING DIRECTOR, FA INTEGRATION

WGR4557/1